# CASES

# APPELLATE COURTS OF ILLINOIS

## SECOND DISTRICT—DECEMBER TERM, 1894.

## Atchison, Topeka and Santa Fe Railroad Company v. Charles Roemer, a Minor, by John L. Dahlem, his Next Friend.

1. INSTRUCTIONS—*Ordinary Care on the Part of Children.*—An instruction for the plaintiff in an action for personal injuries which states that the law does not require the same degree of care on the part of a child between the age of eight and nine years that it does on the part of persons of mature age, is misleading.

2. INFANTS—*When They Acquire the Capacity of an Adult.*—The law can not fix any precise limit of age when a minor acquires the capacity of an adult.

**Trespass on the Case,** for personal injuries. Error to the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the December term, 1894. Reversed and remanded. Opinion filed May 28, 1895.

HALEY & O'DONNELL, attorneys for plaintiff in error; EDGAR A. BANCROFT, of counsel.

MEERS & HENSSGEN and GEO. S. HOUSE, attorneys for defendant in error.

MR. JUSTICE CARTWRIGHT DELIVERED THE OPINION OF THE COURT.

Charles Roemer, a boy about eight years old, sustained a loss of both feet, December 24, 1890, at the crossing of the

(93)

Atchison, Topeka & Santa Fe Railroad over Jackson street in the city of Joliet, by a switch engine running over him. He brought suit by his next friend against the railroad company for the consequent damages, and obtained a verdict for $9,000, on which judgment was entered.

The declaration as added to at different times contained seven counts. A demurrer was sustained to the fourth and fifth counts. No evidence was introduced on the trial in support of the second count, which set up an ordinance of the city requiring the erection and maintenance of gates at the crossing, and the court instructed the jury that the plaintiff could not recover on that count. Of the remaining counts on which a recovery was sought, the first charged negligence in pushing the train over the crossing without having any lookout on the end of the train to warn persons of its approach; the third charged negligence in general in moving the engine and car or cars over the crossing; the sixth charged negligence in permitting too large a space to remain between the rail of the track and the plank of the crossing, and alleged that plaintiff's foot was caught in such space and he was unable to remove it, and was run over, and the seventh charged a duty to keep the spaces between the ties filled with gravel, cinders or other suitable materials, and alleged that defendant negligently permitted a large space between the planking and rail and the spaces between the ties to be unfilled, and approached the crossing without ringing a bell on the engine, and that plaintiff's foot slipped into the space so left and down into the space between the ties, and was fastened there so that he was run over.

The following facts were proved on the trial. Jackson street runs east and west, and the tracks of the Elgin, Joliet & Eastern, the Chicago & Alton and the defendant's railroad cross it at nearly right angles. There are thirteen tracks and a connecting track, and the west two tracks belong to defendant. West of defendant's tracks there is an open space of nineteen and one half feet. On the day of the accident plaintiff left his home east of the tracks and three or four blocks north of Jackson street, and in company with other

boys and a colored woman, picked up coal among the tracks down to the north side of Jackson street. He then crossed to the south side of Jackson street and went west beyond the tracks on the south walk. A switch engine headed south had crossed the street from the north and was coupling onto a car of beer near the street to take it north. The coupling was made and the engine started north to cross the street. The switch engine was of the common kind with a low sloping tender over which the engineer could look, and it had a foot board in front of the tender and one in front of the engine. In going north the tender was in front, the fireman and engineer were in the cab, and a switchman stood on each end of the foot board in front of the engine. As the engine approached the crossing, plaintiff came running back from the west and ran in front of the tender and fell down. He was run over while lying down and his feet were cut off. The engine was running very slowly at the time, perhaps four miles an hour, and not as fast as plaintiff was running. It was in plain sight of plaintiff while he was crossing the open space west of the track. The men on the engine were looking north. Whether the bell was ringing or not was a controverted question.

Plaintiff's account of the accident was that he started west from the tracks on Jackson street intending to go down Scott street into the city to see the Christmas goods in the store windows, but changed his mind and concluded to turn back and go down between the railroad tracks into the city; that he turned around and ran back to take the route between the tracks; that he was going east on the crossing and was just going to turn south between the tracks when his foot was caught between the plank and rail and he fell over eastward, and that he screamed, but was run over. He fell over the east rail. Other witnesses in his behalf gave the same account of his falling down, and said that he fell on his hands facing to the east, and that his foot was in the space between the rail and the plank, and was taken out after being cut off. One of them said that the engine was about ten feet from him when he fell.

There was evidence of witnesses for defendant that a dog was snapping at plaintiff, and that in running away from the dog he ran right in front of the tender and fell down. The surgeon who had the care and treatment of plaintiff at the hospital testified that plaintiff told him that he was frightened by a dog and in running away from it got in the way of the engine. A special policeman at a dime museum, and the engineer, and an employe in the railroad yard, with an office north of Jackson street, each testified to a like statement on separate occasions.

Whatever may have been the occasion for plaintiff running into danger, it is apparent that it was a serious question whether he was in the exercise of reasonable care in so doing. Upon this question the court gave the third instruction at the instance of plaintiff as follows: "In determining whether or not the plaintiff, at the time of going upon the crossing in question was in the exercise of ordinary care, the jury have a right to take into consideration, with the other facts and circumstances shown on the trial, the age and degree of intelligence of the plaintiff at that time. The law does not require that degree of care on the part of a child between the age of eight and nine years that it does on the part of persons of mature age; and if, from all the facts and circumstances disclosed in the trial of this case, the jury, as reasonable men, believe this plaintiff exercised that degree of care which would reasonably be expected to be exercised by an ordinary, reasonable, and prudent child of plaintiff's age and degree of intelligence at that time, then the plaintiff would not be guilty of negligence."

In C. & A. R. R. Co. v. Becker, 76 Ill. 25, an instruction that the law does not require that a boy of six or seven years of age should exercise that degree of diligence that would be required of a grown person was condemned. It was said that the age, capacity and discretion of the child to observe and avoid danger were questions of fact to be determined by the jury, and his responsibility was to be measured by the degree of capacity he was found to possess. It was declared that no definite rule of law could be laid down on

the question of the capacity of a child to observe and avoid danger, and that each case must be judged on its own merits. In R. R. I. & St. L. Ry. Co. v. Delaney, 82 Ill. 198, the above decision was approved and quoted from.   In City of Chicago v. Keefe, it was held that the circumstances must always be taken into consideration, and if a child exercised such care as, under the circumstances, might be expected from one of his age and intelligence it is sufficient.   The decision in I. C. R. R. Co. v. Slater, 129 Ill. 91, seems to be that a child is required to exercise that degree of care and caution which persons of like age, capacity and experience might be reasonably expected to use under the same circumstances, and that if he is found to possess the capacity of an adult, the law would require him to exercise the same degree of care and prudence as an adult.   The question of the degree of capacity and discretion of plaintiff was for the jury, and the doctrine of these and other cases is that he was to be judged by the capacity and experience he was shown to have had.   The statement that the law does not require that degree of care on the part of a child between the age of eight and nine years that it does on the part of persons of mature age, is not in harmony with these decisions. When the Becker case was in the Supreme Court again, it was held that the law would not impute negligence to a child of that age.   In C., St. L. & P. R. R. Co. v. Welsh, it was held that a child over seven years old was incapable of exercising any care for her personal safety, and that it would be idle to submit to the jury the question of comparative negligence in such a case.   There are a number of other cases where it is held as a matter of law that children are incapable of negligence.   The decisions in this State supporting the two opposing views were collected in C. C. Ry. Co. v. Wilcox, 138 Ill. 370, and it was there considered unnecessary to determine which of the two rules should be adopted.   Plaintiff in that case was six years old, and it was held that when considered as a matter of fact for a jury, a child of that age might possess the instinct of self-preservation, but would be incapable of reason or reflection, and that

from the age alone the jury could not have found otherwise.
It was decided that a child of that age can only act by in-
stinct in view of what is actually present to his senses, and
that in consequence of instinct he may be capable of exer-
cising very considerable care for his own safety.   In view
of the decisions it is impossible to say what might be now
held as to the declaration of the instruction that the law did
not set up as high a standard of care for plaintiff as for an
adult but in our opinion it was misleading in this case.   It
is plain that the law can not fix any precise limit of age
when a minor acquires the capacity of an adult.   Plaintiff
lived near the railroad, frequented the system of tracks in
picking up coal and was in the habit of going over this
crossing in attending school.   He must be judged not only
by his age, but by his capacity and his knowledge of the
place and its dangers.   He came across an open space of
nineteen and one-half feet where he could scarcely have
avoided seeing and hearing the engine, and under the above
decision in the Wilcox case he could exercise considerable
care for his own safety as against dangers that he could see.
He was running faster than the engine, and would have got
across ahead of it if he had not fallen, but he was running
a risk of accident by making the attempt.   The evidence
tended strongly to show negligence on his part.   The acci-
dent to plaintiff was a terrible one, and sympathy would
naturally be aroused for the maimed and helpless.   The
parties to the suit could scarcely be on an equal footing be-
fore the jury, and they would naturally be inclined to over-
look negligence on the part of plaintiff if the law would
sanction it on the ground of his age.

There was no negligence on the part of the defendant
causing the injury unless it was in the construction of the
crossing.   It was claimed that the space was too wide.   The
declaration also charged negligence in not filling the spaces
between the ties under the crossing, but this charge was not
sustained by any proof.   There was a sewer under the cross-
ing, and there was a crack that a person could look through
between the rail and the plank, but plaintiff's foot could not

get into it. There were spikes along the rail to hold it in place, and the plank was laid up to the spikes, which left a space of about three-fourths of an inch, through which the sewer was visible. The space in which a foot might be inserted was not deeper than the thickness of the plank and was wholly above the ties. The evidence for plaintiff was that the space was three and one-half inches wide from the edge of the plank to the head of the rail. His uncle, who made the measurements, wore a number eight shoe, and had no trouble in putting his foot in the space and standing on it, nor in taking his foot out. Plaintiff's foot and shoe were very much smaller than those of his uncle. The evidence for defendant was that the edge of the plank had been worn off by the flanges of wheels rubbing against it and that the space from the top of the plank to the head or ball of the rail was three inches.

The evidence for both sides was that a space must be left next to the rail. Two men who had been section foremen on railroads and another who was foreman in a round house testified for plaintiff, and fixed the proper and necessary space to be left in laying the plank at from two to two and one-half inches, and one of them said that when plank was laid two inches from the rail the play of the wheels would bevel it off to two and one-half or two and three-quarters inches, and that such condition could not be averted. The roadmaster of the Chicago and Alton Railroad testified that the planks on that road were laid two and one-half inches from the ball of the rail, and that traffic wore them off half an inch, leaving a space of about three inches. The roadmaster of the Rock Island Railroad testified that the plank should be set from two and three-quarters to three inches from the rail; that if set closer the wheels will cut off the side of the plank, and that in most cases the space will be more than three inches after being in use, and the plank being cut by the wheels. The roadmaster of the Elgin, Joliet and Eastern Railroad fixed three inches as the proper space, and to the same effect was the testimony of the roadmaster for defendant. A civil engineer in that branch of business

on the Michigan Central Railroad said that it was customary to set the plank from three to three and a quarter inches from the ball of the rail. These were all men of long experience in the business, and they were agreed that the play of the wheels would require and make a space of as much as three inches.

It is conceded that space is a necessity, but the charge is that the space in this case is too wide for the safety of the public traveling over the crossing. It was at right angles to the line of travel, and would not admit a foot unless turned from that line. Feet are of all sizes, from those of infants to the largest adults, and the foot of a small child could doubtless be inserted in such a space as would be necessary. It can not be said to be negligence, in view of the testimony, to leave a space in which some one of the various sizes of feet could be inserted. Plaintiff's uncle found the space wide enough to admit his foot and he had no trouble in taking it out again. If the plaintiff's foot was caught, there would be as much and perhaps more reason for saying that the space was too narrow than too wide; for if wider, he would not have been caught, and would have got out without trouble. The next person injured might with equal propriety charge that the space was not wide enough. The case of E. J. & E. Ry. Co. v. Raymond, 47 Ill. App. 242, and 148 Ill. 241, is cited by counsel for defendant in error at the outset of their argument on account of the alleged striking similarity to this case. The child's foot was caught in that case in a space two and one-half inches wide, and could not be extracted by her own efforts and those of her sister. Of course each case must be decided from the evidence in the particular case, and the evidence by which this case is governed would show that the width in that case was necessary and proper. The evidence there was that the space was from five to five and one-half inches deep, which was unquestionably needless; such depth was not reasonably necessary nor reasonably safe; but the case was affirmed on account of other negligence which caused the injury while the child was unable to escape. The evidence in this record

shows that the necessary space would admit the plaintiff's foot if turned in the direction of the opening, and that it was not deeper than the thickness of the plank.

Perhaps the jury could understand how plaintiff could get his feet fast in the opening as he testified, but it is not easy to learn from the record how it could be done. He said that he was going east across the track, and was just going to turn south when one foot went into the opening between the plank and the rail and got caught, and he fell down, and then the other foot went in after he fell down and they were both caught. The testimony was that he fell down eastward on his hands across the rail at right angles with the opening. In that position he might have his toes and the front ends of his feet in the opening, but they could scarcely be fast, and we understand the claim to be that the feet were down in the opening and fast there. In this position, when fallen down facing east, that would seem to be a physical impossibility. His foot could not have got caught before he fell down, as he stated, unless it was so turned north and south in line with the opening, and if that was so it is hard to see how he could have fallen in the position claimed or have got his other foot in the opening after he was down. According to the testimony of the four witnesses who said that he gave them an account of the accident as being caused by a fright on account of a dog, he did not then claim that he was caught in the opening. He denied making the statements to them, but their testimony certainly casts some doubt on his present account. One of his feet was in the opening after it was cut off, but that is not conclusive evidence that it was in there before, as the flange of the wheel may have crowded it in.

On a review of all the evidence we feel unable to sustain the judgment, and it will be reversed and the cause remanded.